UNITED STATES, Appellee,

v.

Alan N. SCOTT, Defendant, Appellant.

Nos. 99–2236, 00–1379, 00–1381, 00–1669, 00–1767 and 00–2350.

United States Court of Appeals, First Circuit.

Heard Sept. 5, 2001.

Decided Oct. 30, 2001.

Rodney S. Dowell, with whom Berman & Dowell was on brief, for appellant.

Louis M. Fischer, United States Department of Justice, with whom James B. Farmer, United States Attorney, and John M. Hodgens, Jr., Assistant United States Attorney, were on brief for appellee.

Before BOUDIN, Chief Judge, CYR, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

Identity theft is said to be among this country's fastest growing crimes. In the 1990's and earlier, Alan Scott, a former paralegal handy with documents, apparently enhanced his income through an extensive array of white collar crimes using the identities of others. Those of his activities that took place in the late 1990's led to a series of indictments and three separate criminal cases against him, one case a year from 1997 to 1999; all three cases led to convictions. He appeals in each and we handle the three cases in this omnibus opinion. We take the cases in chronological order.

In a 1997 case, Scott pled guilty to bank fraud, 18 U.S.C. § 1344 (1994), and to making and possessing a forged check, 18 U.S.C. § 513(a) (1994). Scott took checks from a Boston law firm that had employed him as a legal assistant in 1995. The checks were payable to clients and to the firm; Scott deposited the checks, with forged endorsements, in bank accounts in Texas. For these crimes he received a combined sentence of 96 months and was ordered to pay restitution of $1,381.00. With his conditional plea, Scott reserved his right to appeal certain issues: whether venue in Massachusetts was improper as to the charges, and whether his motion to suppress evidence (on the same grounds as in the income tax cases, discussed below) was wrongfully denied. He also appeals the restitution order. That is appeal No. 00–1381.

In a 1998 case, a jury convicted Scott of conspiring to make and of making false claims to an agency of the United States, 18 U.S.C. §§ 286, 287 (1994). Scott filed twenty false income tax returns with the IRS for the tax year 1996 seeking tax refunds in the names of at least twelve people. He used four coconspirators to carry out the scheme, and the intended loss to the government exceeded $80,000.00. For these crimes he received sentences of 96 months for the conspiracy and 60 months for the false returns, concurrent with each other and with the sentence imposed in the 1997 case; he was also ordered to pay restitution of $37,970.68. Scott now appeals the district court's denial of his motion to suppress certain evidence, several of its evidentiary rulings, and some of its sentencing decisions. Those are appeals Nos. 99–2236, 00–1379, and 00–2350.

In a 1999 case, Scott also pled guilty to an additional and different bank fraud, 18 U.S.C. § 1344, and to conspiring to commit that fraud, 18 U.S.C. § 371 (1994). The scheme involved fraudulently obtaining bank automobile loans. For this crime he was sentenced to a 46 month sentence, consecutive to those for the earlier cases, and was ordered to pay restitution of $35,500.00. With his conditional plea, Scott reserved the right to appeal the denial of his motion to dismiss for claimed Speedy Trial Act violations and the denial of a motion to suppress evidence. He also appeals the sentence and restitution order. Those are appeals Nos. 00–1767 and 00–1669.

Several issues presented by this appeal are novel to us or worth emphasizing, and we list them in the order we discuss them:

1. In analyzing venue, we modify this Circuit's "key verb" approach in light of recent Supreme Court cases.
2. We decide that reasonable suspicion of the fraud of attempting to pass a bad check sufficient to justify an investigative stop under *Terry v. Ohio* does not alone amount to a suspicion that the suspect is armed and dangerous sufficient to justify a frisk.
3. We apply the inevitable discovery doctrine to a defendant whose crime

would inevitably have been discovered from the statements of a codefendant where those statements were given before the codefendant received his *Miranda* warnings.

4. We uphold the admissibility of opinion testimony of a non-expert witness authenticating or identifying handwriting and discuss the relationship between Federal Rules of Evidence 701 and 901(b)(2).

5. We discuss how restitution orders in cases where two or more defendants are ordered to pay restitution for the same loss should be handled to be clear that the restitution required does not exceed the sum of the loss.

6. We hold on the facts of this case that a trial court is not in compliance with the Speedy Trial Act when it takes a motion to suppress under advisement for over 120 days, disposes of almost all matters, requests additional filings as to certain materials, and relies alone on this request for additional filings to say there was compliance with the Act.

We turn to the cases.

## I. *The 1997 Bank Fraud and Forged Securities Case* No. 00–1381

Scott pled guilty to this offense. His conditional plea reserved the issues we discuss. A summary of the facts follows.

From April to December of 1995, Scott was employed as a paralegal at a small Boston area law firm. Knowing that Scott had a criminal record, a partner of the firm wanted to give him an opportunity to get his life straight.[1] In July of that year Scott opened by mail two accounts at the USAA Federal Savings Bank in San Antonio, Texas. He soon mailed deposits to

those accounts using funds that were not his.

The law firm regularly received checks payable to its clients (or to its clients and the firm) from insurance companies. Scott stole five of these checks in or around September and October of 1995. In October he deposited all five of them, with forged endorsements, into his Texas bank accounts. The stolen checks were apparently sent by mail (or the private equivalent) to the bank. Unsurprisingly, the postmarks were not kept. Scott himself appears to have forged at least one of the endorsements on the checks. At the time the checks were deposited, Scott was working at the firm and living in Massachusetts under supervised release. Under the terms of his supervised release, Scott was not to leave Massachusetts. After Scott was arrested in Natick, Massachusetts on December 5, 1995—we discuss the arrest, relevant to the later cases, in Part II of this opinion—a partner of the firm visited Scott and became convinced Scott had taken the checks.

### A. *Venue*

Scott says that venue for each of the forgery and bank fraud offenses was properly in Texas, not Massachusetts, and so his convictions should be invalidated.

We review legal conclusions de novo, *Campos–Orrego v. Rivera*, 175 F.3d 89, 96 (1st Cir.1999), and give deference to the district court's factual conclusions as to venue, *United States v. Ochoa*, 229 F.3d 631, 636 (7th Cir.2000). The right to be tried in the appropriate venue is one of the constitutional protections provided to defendants by the Sixth Amendment. The burden of showing proper venue is on the government, which must do so by a preponderance of the evidence. *United*

---

**1.** This brings to mind the adage that no good     deed goes unpunished.

*States v. Lanoue,* 137 F.3d 656, 661 (1st Cir.1998). We review the evidence on venue in the light most favorable to the government. *Id.*

Two recent Supreme Court opinions on venue cause us to shift somewhat our prior approach to venue questions. In 1993 this Circuit endorsed the use of the "key verb" approach. *United States v. Georgacarakos,* 988 F.2d 1289, 1293 (1st Cir.1993). That approach analyzed the key verbs in the statute defining the criminal offense in order to determine the scope of the relevant conduct. *Id.; United States v. Tedesco,* 635 F.2d 902, 905 (1st Cir.1980). To the extent there was any suggestion in *Georgacarakos* that the "key verb" approach was an exclusive approach, as opposed to one helpful approach, that suggestion is now abandoned.

In 1999, the Supreme Court said that words other than the verbs used in a statutory definition of an offense also have import for venue:

> [W]e have never before held, and decline to do so here, that verbs are the sole consideration in identifying the conduct that constitutes an offense. While the "verb test" certainly has value as an interpretive tool, it cannot be applied rigidly, to the exclusion of other relevant statutory language. The test unduly limits the inquiry into the nature of the offense and thereby creates a danger that certain conduct prohibited by statute will be missed.

*United States v. Rodriguez–Moreno,* 526 U.S. 275, 280, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999). Rather, the Court, as it had earlier done in *United States v. Cabrales,* 524 U.S. 1, 6–7, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998), used a three part test for venue. *Rodriguez–Moreno,* 526 U.S. at 279–81, 119 S.Ct. 1239.

Venue must be determined from the nature of the crime alleged, determined by analyzing the conduct constituting the offense, and the location (or, if the crime is a continuing one, locations) of the commission of the criminal acts. If the crime consists of distinct parts, taking place in different localities, then venue is proper wherever any part can be proved to have taken place.[2] *Id.* That is the test we now apply.

The nature of the crime of forgery is determined by the statutory definition, which provides:

> Whoever makes, utters or possesses a counterfeited security of a State or political subdivision thereof or of an organization, or whoever makes, utters or possesses a forged security of a State or political subdivision thereof or of an organization, with intent to deceive another person, organization, or government shall be fined under this title or imprisoned for not more than ten years, or both.

18 U.S.C. § 513(a) (1994).

The language of the bank fraud statute, in turn, provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> > (1) to defraud a financial institution; or
> >
> > (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial insti-

---

**2.** This concept is codified in part in 18 U.S.C. § 3237(a) (1994), which provides:

> Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed. . . .

tution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344 (1994).

■ Scott's argument is that there was no evidence he forged any endorsements in Massachusetts or mailed any checks from Massachusetts. He argues that the checks could have been mailed from anywhere. Indeed, he supplied an affidavit that he was a frequent traveler during this period, often away from Massachusetts, although the terms of his supervised release forbade exactly such travel.

Scott then relies on the supposed absence of facts and invokes the hoary common law presumption that forged checks are presumed to be made where they are first found in their altered state or uttered. *See United States v. Britton,* 24 F. Cas. 1239, 1241 (C.C.D.Mass.1822) (No. 14,650). Since it is undisputed the checks were "uttered" in Texas, he argues, venue belongs in Texas. The argument is flawed. The presumption operates, as Justice Story said in *Britton,* only when there is no evidence of where the instrument was uttered, forged, or possessed. *Id.* That is not this case, as we show.

The district court considered that the theft of the checks was the first step in "making" the forgery. It relied on the Second Circuit's decision in *United States v. Delia,* 944 F.2d 1010 (2d Cir.1991). Scott rejoins that *Delia* should be rejected, that taking the checks was merely a preparatory step and that, under this Circuit's law in *Georgacarakos,* preparatory steps are not relevant to a venue analysis. Scott's argument overreads *Georgacarakos,* but the *Delia* issue of whether theft of the instrument is part of "making" the forgery is academic here and we need not

pursue it. Other facts establish the necessary connection.

It is rational to infer that soon after Scott stole the checks in Boston, the checks were fraudulently endorsed and mailed. Scott endorsed at least one of the checks, and the checks, stolen between September and October, were all deposited in October. This makes it highly likely that both activities—the endorsements and the mailings—took place in Massachusetts. That is, it is highly likely that Scott both "made" and "possessed" the forged checks, *see* 18 U.S.C. § 513(a), in Massachusetts. Speed was essential to Scott's forgery scheme. As soon as the law firm discovered the checks were gone, the firm would have notified the insurance companies, which would have sought to stop payment on the checks. Furthermore, that Scott was on supervised release at the time also suggests the need for speed as part of the scheme. Finally, Scott says he acted alone in this scheme, which further reinforces the likelihood he performed these acts in Massachusetts.

■ The bank fraud analysis has a different cast. One of the elements of bank fraud is proof of a scheme to defraud. *United States v. Brandon,* 17 F.3d 409, 424 (1st Cir.1994). Taking the checks was an act necessary to this particular scheme. For this reason and those given before, there was adequate evidence the offense was both begun and continued in Massachusetts. Bank fraud is also a continuing offense under 18 U.S.C. § 3237(a) and so venue was proper wherever the offense was "begun, continued, or completed."

Scott also makes a constitutional policy argument that the purposes of the Sixth Amendment venue guarantee are offended by finding venue in Massachusetts. The argument fails. This is not an instance of government forum shopping or of a venue

with the barest connection to the defendant. This is not at all like *Cabrales,* in which the Supreme Court upheld a dismissal for improper venue. 524 U.S. at 3–4, 118 S.Ct. 1772. There, the defendant money launderers' only connection with the Missouri venue was that the money, laundered entirely in Florida, was derived from illegal drug sales in Missouri. *Id.*

The district court's venue determination was correct.

## B. *Restitution*

Scott also challenges the district court's restitution order. He claims there is a dispute as to the proper amount of restitution,[3] and that the district court's restitution determination was unsupported by a preponderance of the evidence. The district court sentenced Scott to pay $1,381.00 in restitution to the victim insurance companies, unless he had already reimbursed them. There is no dispute as to the amount of the uttered checks. Scott's claim is simply that the award of restitution is unjustified because, he says, the insurance companies were reimbursed and therefore suffered no actual loss. But the district court's restitution order was contingent on whether Scott had already reimbursed the insurance companies, and there is no evidence that he did. Accordingly, there is no issue as to the restitution order.[4]

## II. *The 1998 False Income Tax Returns Case* Nos. 99–2236, 00–1379, and 00–2350

Scott makes three categories of challenges to the trial court's rulings, raising nine separate issues. He challenges the court's denial of his motion to suppress the fruits of the searches of his residence and automobile. He challenges certain evidentiary rulings, primarily the decision to permit an IRS agent to give an opinion as to whether handwriting on a number of documents was Scott's own. Finally, he challenges two elements of the punishment: the enhancement of his sentence on the ground that he was a leader or organizer of the fraudulent scheme, and the restitution order.

A brief overview of the facts is helpful. In 1996, the IRS received a set of at least twenty fraudulent tax returns, each requesting a refund of several thousand dollars. These returns used genuine names and Social Security numbers, but the taxpayers whose names and numbers appeared on the returns did not file the returns; they listed genuine employers, but the taxpayers did not work for those employers. The salaries and refund requests were wholly fabricated. Key similarities between the returns—identical names, employers, wages, expenses, and other entries—pointed to a common origin. Some of the returns were deposited directly to an account at the USAA Federal Savings Bank in San Antonio, Texas; others were made out to various addresses in the Boston area.

The IRS became aware of the fraud and began an investigation. Details on the false returns led agents to suspect Scott, whom they already knew from past inves-

---

3. At sentencing, Scott argued that the bank, not the insurance companies, was the real victim. The district court, however, correctly found that the insurance companies, whose checks were wrongfully deposited into Scott's bank accounts, were the true victims. The argument Scott chooses to raise here is utterly without merit.

4. Scott also incorporates into his appeal of the 1997 convictions his arguments from the appeals of the 1998 convictions, Nos. 99–2236, 00–1379, and 00–2350, regarding the suppression of certain evidence from searches he claims were illegal. We reject these arguments for the reasons stated in section II.A of this opinion.

tigations and who had a substantial criminal record. For example, some of the returns listed Turner Construction—a real corporation unrelated to the fraud—as an employer, and Scott had used Turner Construction's name in some of his earlier frauds. In addition, Scott had an account in his own name at the USAA Federal Savings Bank that came to the IRS's attention in an earlier search, although that account was not directly used in the tax fraud scheme. As a result, IRS agents began surveillance of Scott in October 1997.

The investigating agents obtained search warrants for Scott's residence in Jamaica Plain, Massachusetts, and for his car in November 1997. They executed the warrants on November 25 and found evidence in Scott's bedroom linking Scott to the false income tax returns. This evidence included identification cards, materials for making identification cards, a mailbox key, various handwritten notes of names and addresses, and other documents.

At trial, Scott moved to suppress the results of the 1997 search based in part on the 1997 warrant's reliance on several earlier searches that occurred in 1989, 1992, and 1995. To decide this case, we need describe only the events leading to the 1995 search. These events occurred on December 5, 1995, when Scott apparently drove Brian Stephens, a codefendant in this case, to a Circuit City store in Natick, Massachusetts. There, Stephens attempted to pay for a camcorder by check. Stephens identified himself as Thomas Judge to the store's employees and presented false identification bearing that name, an address, and a date of birth. The employee to whom he presented the check submitted it to a routine electronic verification service, which returned an unfavorable re-

sult. Stephens then left the store without reclaiming his identification.

The store's manager, David Homsi, became suspicious and watched Stephens as he left. Homsi noted that Stephens left in a white Pontiac Bonneville driven by a white male, wrote down the license number of the car, and called the Natick police. Officer Daniel Brogan, who responded to the call, told Homsi to call the police again if Judge returned. At that time, Homsi gave Brogan the identification card. Shortly thereafter, Stephens called the store, asking permission to retrieve his identification. Stephens then returned and encountered Brogan and another officer. Brogan observed that Stephens matched both the description given by Homsi and the picture on the Judge identification card. On seeing the police, Stephens began to run towards Scott's car, which was parked nearby. Stephens was stopped at the end of the row where Scott was parked. The officers ordered Stephens to lie down and, after he obeyed, placed him in the back of a police cruiser.

Brogan then approached Scott's car, which Homsi indicated to be the car that Stephens had used earlier. The car was parked away from the entrance to the nearest store, in a relatively secluded area. Its motor was running. Brogan walked up to the car and began to question Scott, asking him why he was waiting in the parking lot. Scott replied that he was waiting for a call and showed Brogan a beeper. Brogan then asked Scott if he knew the man (Stephens) whom the police had just detained in the parking lot. Scott answered that he did not. Brogan concluded that Scott was lying and that he was involved with Stephens in a crime. Brogan advised Scott of his rights, and ordered him out of the car. He pat frisked Scott and found nothing. Brogan then searched the passenger compartment

of the car. The search was not merely visual; he opened the glove compartment. In the glove compartment, he found a hypodermic needle, possession of which without a prescription or other justification violated state law, Mass. Gen. Laws ch. 94C, § 27(a) (2000); for this offense, he arrested Scott. At the suppression hearing, Brogan testified that he searched the car because it was cold out and he did not want to put Scott back into the car without making certain it contained no weapons. Brogan's police cruiser was nearby and could have been used for questioning.

Brogan then returned to Stephens (whom he still knew only as Judge) and together with another officer began to question him. Brogan asked Stephens his age and place of residence; Stephens gave answers different from those on the false Thomas Judge identification card. When Brogan asked where Stephens had obtained the information on the card, Stephens replied that he had taken it from a telephone book. Brogan then arrested Stephens for attempting to pass a bad check and for conspiring with Scott to do so.

An inventory search of Scott's car revealed some of the materials Scott sought to have suppressed in this trial, which included employee identification cards and a birth certificate. These materials linked Scott to Ralph Swoboda, in whose name a false tax return relevant to this case was filed. A further link to Lee Morrison, a coconspirator in this case, was established by a Social Security card bearing Morrison's name; the Natick police found the card in Scott's wallet in the course of booking. They also found in the wallet a deposit slip and a check from an account of Scott's at the USAA Federal Savings Bank—the same bank, although not the same account, to which the conspirators in this case arranged for some of the fraudulently obtained tax refunds to be sent.

### A. Denial of the Motion to Suppress

Our review of the ultimate determinations of probable cause and reasonable suspicion on a motion to suppress is de novo. Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Review of subsidiary factual findings is for clear error. Id. Law enforcement officers have probable cause for a search when "the facts and circumstances within their ... knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" the search will reveal the fruits or instrumentalities of a crime. Brinegar v. United States, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)) (bracketed alteration in original) (internal quotation marks omitted); see also Ornelas, 517 U.S. at 696, 116 S.Ct. 1657.

Two warrants issued in 1997 for the search of Scott's home and his car. An affidavit in support of the warrants contained references to material found in seven earlier searches, including searches in 1989, 1992, and 1995. Scott makes a wholesale attack on all of the warrants, but much of the attack is a sideshow. For purposes of this case, Scott needed primarily to suppress the results of the 1997 searches, although some evidence from the 1995 search was also introduced against him at trial. The 1989 and 1992 searches are pertinent here only if the 1997 warrants depended on the results of each of those searches for the requisite probable cause showing. See United States v. Veillette, 778 F.2d 899, 904 (1st Cir.1985) ("[T]he [illegally obtained evidence] should be set to one side ... and the remaining

content of the affidavit examined to determine whether there was probable cause to search, apart from the tainted averments."). We conclude that the 1989 and 1992 searches are plainly unnecessary to support probable cause for the 1997 searches and therefore unnecessary to the resolution of this case.

The 1995 search results were, however, much more important to this case. As the affidavit used to apply for the 1997 warrants states, the 1995 search produced evidence "that directly links [Scott] to the questionable refund scheme" that led to this case.[5] This evidence may have been crucial to the application for the 1997 warrants, and some of it was introduced directly against Scott at trial. Moreover, the government agrees that the validity of the 1995 search is material to the 1997 conviction, No. 00–1381, which we discuss in Part I, and so we consider whether that search was adequately justified. Our conclusion is that the 1995 search was not subject to the exclusionary rule, so no arguable issue is presented as to the use of the results of that search in the 1997 warrant. As such, the 1997 warrant has more than adequate support, and the district court was correct to deny the motion to suppress.

1. *The 1995 Warrantless Search of Scott's Car*

a. *Constitutionality of the Search*

Law enforcement officials gained access to the contents of Scott's car via a routine inventory search after the Natick police impounded the car incident to Scott's arrest on charges of possessing illegally a hypodermic needle. If the arrest was valid, the inventory search was constitutional

even though the police had neither a warrant nor probable cause. *Colorado v. Bertine,* 479 U.S. 367, 371, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). Whether the arrest was valid depends on the constitutionality of Brogan's actions leading up to the arrest. Our inquiry focuses first on Brogan's temporary detention of Scott, which we examine as a seizure under the Fourth Amendment, and second on Brogan's order that Scott step out of the car and the subsequent sweep of the car, which we examine as searches. If any of these measures was unconstitutional, that illegality may taint the subsequent arrest and inventory search. *See Wong Sun v. United States,* 371 U.S. 471, 484–87, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

We assume based on the district court's opinion that Scott was not free to leave, or at least reasonably believed he was not free, when Brogan began questioning him. The government has argued on appeal that the record would support a conclusion that Scott might have left at any time until Brogan ordered him out of the car. Were this so—were Brogan's actions in questioning Scott fully consensual—we would engage in no Fourth Amendment scrutiny of the questioning, as a suspect's voluntary conversation with police is neither a search nor a seizure under the Fourth Amendment. *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). The district court made no finding on whether Brogan exercised his authority to detain Scott, choosing instead to analyze the reasonableness of Brogan's actions under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)—and thus at least implicitly assumed that Scott did not consent to converse with Brogan. We follow and approve this part of its analysis.

---

**5.** Indeed, Scott appears to have sought revenge of sorts for the 1995 arrest in his later tax refund scheme. The name of the arrest-ing officer in 1995, Daniel Brogan, was used on a false tax return.

█ The Fourth Amendment rule laid down in *Terry* permits the police to detain temporarily a suspect on a reasonable suspicion, supported by articulable facts, that the suspect has committed or is about to commit a crime. *Id.* at 21, 88 S.Ct. 1868. In this case, Brogan had substantial information supporting a suspicion that Stephens, whom he then knew only as Judge, had attempted to pass a bad check. Stephens, first, had offered a check that was rejected; second, had done so in a manner that aroused the suspicions of store employees, who called the police; and, third, had run from police officers who approached him after he returned to collect his identification. An individual's flight from police combined with other observations by a police officer may support reasonable suspicion sufficient for detention under *Terry*. *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). In *Wardlow* itself, the only relevant fact other than flight known to the detaining officer was the suspect's presence in an area known for crime. *Id.* at 124–25, 120 S.Ct. 673. Stephens's prior behavior at the Circuit City store suggested guilt more strongly than would simple presence in such an area, so that the police knew more than was necessary to justify temporarily detaining Stephens.

Moreover, Brogan knew enough to suspect reasonably that Scott was involved in the same crime. Brogan knew from Homsi that Scott was driving the same car that had earlier dropped Stephens off at Circuit City, and he knew from his own observation that Stephens had run towards the car. He had also noted that Scott had parked further from the store than one

ordinarily would if merely driving a friend on an innocent errand. These observations, however generously read, do not approach probable cause; but they satisfy, as the district court concluded, the requirement that the police know specific and articulable facts on which they may base a temporary detention. Brogan's actions prior to his frisk of Scott and sweep of the car were therefore legal.[6] But the 1997 warrants rely on what was found in Scott's car in 1995, and so the analysis continues.

██ We are less sanguine about the next stage of the encounter: Brogan's frisk of Scott and protective sweep of the car. A police officer may frisk a suspect— that is, search the suspect's person for weapons—on reasonable suspicion that the suspect is armed and dangerous. *Terry*, 392 U.S. at 27, 88 S.Ct. 1868. A search of the passenger compartment of a car in which a suspect rides requires the same degree of suspicion. *Michigan v. Long*, 463 U.S. 1032, 1049–51, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). When the officer suspects a crime of violence, the same information that will support an investigatory stop will without more support a frisk, *Terry*, 392 U.S. at 33, 88 S.Ct. 1868 (Harlan, J., concurring), and therefore by implication a car search. This Circuit has extended that rule to encompass crimes commonly associated with violence, even though the criminal act itself may be nonviolent; an example is large-scale trafficking in illegal drugs. *United States v. Gilliard*, 847 F.2d 21, 25 (1st Cir.1988) (citing *United States v. Trullo*, 809 F.2d 108, 113 (1st Cir.1987)).

---

6. Scott argues on appeal, as he did before the district court, that Brogan in fact arrested him by blocking in his car and that Brogan's actions were therefore illegal absent probable cause. On the facts as we have described them—and we are satisfied the district court did not clearly err in so finding them—no such arrest occurred. *See United States v. Jackson*, 918 F.2d 236, 238 (1st Cir.1990) ("The police may conduct an investigatory stop by blocking the egress of a vehicle in which a criminal suspect is riding....").

■ The investigation involved no more than the fraud of attempting to pass a bad check. The district court nevertheless concluded that Brogan's frisk of Scott and sweep of the car were permissible, relying on *United States v. Edwards*, 53 F.3d 616 (3d Cir.1995), for the proposition that reasonable suspicion of fraud justifies a frisk. The Third Circuit reasoned in *Edwards* that the perpetrators of a fraud in broad daylight may well arm themselves to make an escape. *Id.* at 618. This logic would seem to permit a frisk on reasonable suspicion of almost any felony, and we do not follow it today. Nor do the other facts relied upon by the district court seem to us to establish reasonable suspicion that Scott was armed and dangerous. The district court could fairly credit Brogan's testimony that the car was parked some distance from the store, that there was little traffic in the parking lot, that Brogan was alone in confronting Scott, and that Scott knew that the police had already detained Stephens. These facts, however, provide an insufficiently particular basis for Brogan to suspect reasonably that Scott was armed and dangerous, and so do not support the district court's conclusion that the frisk and sweep were legal. *See Sibron v. New York*, 392 U.S. 40, 63–66, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) ("[To conduct a] self-protective search for weapons, [an officer] must be able to point to particular facts from which he reasonably inferred that the individual [searched] was armed and dangerous.").

b. *Inevitable Discovery*

■ That, though, does not end the analysis. We also consider an alternative ground of decision presented by the district court. Although evidence derived from unlawful searches is generally subject to suppression, *see Wong Sun*, 371 U.S. at 484–87, 83 S.Ct. 407, there are numerous exceptions to this rule. One

such, the inevitable discovery exception, applies to any case in which the prosecution can show by a preponderance of the evidence that the government would have discovered the challenged evidence even had the constitutional violation to which the defendant objects never occurred. *Nix v. Williams*, 467 U.S. 431, 440–48, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The district court found that exception to apply to Scott's case, and we agree.

This Circuit discussed the rule of inevitable discovery at length in *United States v. Silvestri*, 787 F.2d 736 (1st Cir.1986), and has subsequently relied upon *Silvestri*'s discussion in numerous cases, including *United States v. Zapata*, 18 F.3d 971, 978 (1st Cir.1994), and *United States v. Ford*, 22 F.3d 374, 377–81 (1st Cir.1994). *Silvestri* divided the question of inevitable discovery into three parts: first, whether "the legal means [are] truly independent"; second, whether "both the use of the legal means and the discovery by that means [are] truly inevitable"; and, third, whether "the application of the inevitable discovery exception either provide[s] an incentive for police misconduct or significantly weaken[s] fourth amendment protection." 787 F.2d at 744.

■ The district court reasoned that the questioning of Stephens would have led inevitably to Scott's arrest, even had the illegal search of Scott's car never occurred. Stephens's admission of his true age and place of residence allowed the officers to infer his use of false identification, which gave them probable cause to arrest him for attempting to pass a bad check. Scott's lie to Brogan that he did not know Stephens would then have extended probable cause from Stephens to Scott, and Scott would have been arrested and his car subjected to a routine inventory search. The district court's conclusions

about what would have occurred are correct. Thus, the alternate avenue of inquiry that involved questioning Stephens was truly independent, because it did not rely on any information derived from Scott;[7] and it was truly inevitable, because the district court concluded without clear error that Brogan would have detained Scott until he finished questioning Stephens, and the results of that questioning are a matter of historical fact. *See Nix,* 467 U.S. at 444 n. 5, 104 S.Ct. 2501 (emphasizing the importance of "demonstrated historical facts").

The first two questions posed by *Silvestri* are thus answered in the affirmative, save for a difficulty we now reach. The Supreme Court and this Circuit have invariably stated the doctrine of inevitable discovery as requiring inevitable discovery by "legal" or "lawful" means. *E.g., Nix,* 467 U.S. at 444, 104 S.Ct. 2501; *Ford,* 22 F.3d at 377–79; *Silvestri,* 787 F.2d at 738–46. None of those cases involved a third

party and a defendant's claim that the inevitable discovery doctrine should not apply because the third party's rights had been violated. This case involves such a claim because the district court concluded that the police illegally arrested Stephens without probable cause and that Brogan then illegally questioned him without the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The government has not argued to us that the district court was wrong, and so we assume that Stephens's statements, on which the government's claim of inevitable discovery rests, were taken in violation of Stephens's *Miranda* rights. The context of the district court's conclusion is important. The police did not believe that they had arrested Stephens before he made the statements; they thought the arrest came later, after the statements, and that the *Miranda* warnings were timely given.[8] Only on later judicial review did

7. Scott has pressed with some vigor his position that the questioning of Stephens cannot support the application of the inevitable discovery exception to this case because it occurred after the actual search of Scott's car. *Silvestri,* however, rejected a strict requirement that the alternate legal avenue of investigation be actively pursued at the time of the illegal search or seizure. 787 F.2d at 745–46; *see also Ford,* 22 F.3d at 378. In any event, the alternate avenue was being actively pursued; Stephens was detained and awaiting questioning at the very moment that Brogan searched Scott's car.

The question of inevitable discovery will certainly be easier if the government has probable cause to search or to arrest before undertaking the illegal search. Indeed, there may exist a requirement of this nature in cases involving an illegal warrantless search followed by a legal one pursuant to a warrant. *See Ford,* 22 F.3d at 378 (quoting *Silvestri,* 787 F.2d at 745). In this case, it is enough that the police had the relevant level of particularized suspicion—reasonable suspicion under *Terry*—to detain both men before the illegal search took place.

8. Perhaps they thought as well that asking Stephens his age and place of residence fell within an exception to *Miranda* discussed in *Pennsylvania v. Muniz,* 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990). In that case, a plurality of the Supreme Court reasoned that police questions regarding suspects' names, addresses, and other information obtained in the booking process fall outside *Miranda*'s scope. *Id.* at 600–02, 110 S.Ct. 2638 (plurality opinion); *see also United States v. Reyes,* 225 F.3d 71, 76–78 (1st Cir.2000) (applying the exception). Cases in which law enforcement officers have reason to know that routine booking questions may indeed produce inculpatory responses, however, form an exception to the exception. *United States v. Doe,* 878 F.2d 1546, 1551–52 (1st Cir.1989); *see also Muniz,* 496 U.S. at 602 n. 14, 110 S.Ct. 2638. In this case, for example, Brogan had reason to know and indeed knew full well that answers from Stephens about his age and place of residence differing from the details on the identification card in Brogan's possession gave the police evidence of Stephens's intent to defraud Circuit City

a court determine that the arrests came earlier. We have no way to know whether Stephens would have voluntarily provided any identifying information in the course of the *Terry* stop had the sequence of events been only slightly different.

Ordinarily, that Stephens did not receive *Miranda* warnings would not benefit Scott in his attempts to exclude evidence. Any illegality did not violate Scott's personal rights, and courts have restricted the exclusionary rule both in the context of searches and in the context of *Miranda* to violations of a defendant's personal rights. *Rakas v. Illinois,* 439 U.S. 128, 140–50, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (applying this principle to an illegal search); *United States v. Lopez,* 709 F.2d 742, 745 n. 3 (1st Cir.1983) (applying it in passing to a failure to give *Miranda* warnings). Scott's case, however, presents the distinct question whether the government in showing inevitable discovery may rely on an illegal action that did not violate the relevant defendant's personal rights. We know of no rule that the "legality" aspect of the inevitable discovery doctrine plays no role in the analysis when third party rights are involved. The deterrence rationale may be significant in such cases as well.

We think this question is close. The application of the inevitable discovery exception to this case would allow the government to benefit at least somewhat from the unconstitutional actions of the Natick police—and if here there were two illegalities rather than one, that arguably strengthens rather than weakens the need for suppression as a means of deterrence. The history of the inevitable discovery exception, however, is instructive. The Supreme Court has described this exception as an "extrapolation," *Murray v. United States,* 487 U.S. 533, 539, 108 S.Ct. 2529,

101 L.Ed.2d 472 (1988), from the older principle of the independent source. This principle, discussed by Justice Holmes in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), is that although the government may first learn of certain facts by illegal means, it may nevertheless prove those facts at trial if it later learns of them by independent, legal means. *Id.* at 392, 40 S.Ct. 182 ("Of course this does not mean that ... facts [illegally] obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others....").

■■ We think, moreover, that in the case of an actual discovery by an independent source, a defendant cannot obtain the remedy of suppression by simply relying *solely* on an illegality related to that source if the illegality did not violate the defendant's personal rights. There is no per se rule operating in either direction. An independent source permits use of the evidence because it breaks the causal chain between the constitutional violation alleged and the discovery of the evidence challenged. *See Segura v. United States,* 468 U.S. 796, 814, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) ("[E]vidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence."); *see also United States v. Crews,* 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) ("In the typical 'fruit of the poisonous tree' case ... the question before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality."). The question in inde-

---

amounting to probable cause for an arrest. Accordingly—assuming that the district court was correct that Stephens was in custody—the *Miranda* warnings were required.

pendent source cases is one of causation; suppression requires at least a finding that the challenged evidence would not have been obtained but for a constitutional violation as to the defendant in the case at issue. We conclude, because of the close link between the two doctrines, that the principle should be the same in the case of inevitable discovery: a means by which challenged evidence would inevitably have been discovered that itself violates the law is not, *by that violation alone*, unlawful as to a defendant if those means did not violate that defendant's personal rights.

*Silvestri*'s third question, however, focuses the issue: "application of the inevitable discovery exception [must not] provide an incentive for police misconduct or significantly weaken fourth amendment protection." 787 F.2d at 744.[9] Such an analysis necessarily dwells closely on the facts of a particular case. Moreover, a court in conducting this analysis must bear always in mind the social costs of the exclusionary rule. *Cf. People v. Defore*, 242 N.Y. 13, 150 N.E. 585, 587 (1926) (Cardozo, J.) ("The criminal is to go free because the constable has blundered.").

We look at the incentives here. In this case, there were two unconstitutional acts, rather than one, and we think it appropriate to take Brogan's treatment of Stephens into account in assessing the facts as a whole with regard to Scott. On these facts, Brogan had little incentive to violate Stephens's *Miranda* rights (had he known he was doing so) in order to gain the advantage with Scott of use of the inevitable discovery doctrine. Brogan's incentive was to be able to use Stephens's statements against him. Application of the inevitable discovery doctrine would not, we think, act here as an incentive to

unconstitutional behavior. Other cases may present different incentives and warrant a different outcome. We also take into account that neither constitutional violation was truly egregious, as was the excessive force used in *United States v. Rullo*, 748 F.Supp. 36 (D.Mass.1990). Moreover, although we have assumed the correctness of the district court's view that the police subjected Stephens to a de facto arrest, we think that point was itself close and that the police might have reasonably believed they had undertaken only a justified investigatory stop. We hold that on the facts of this case the doctrine of inevitable discovery applies and exclusion is not required to remove incentives for future police misconduct.

### 2. The 1997 Search Pursuant to Warrant

The district court found that even were the results of the 1995 search subject to exclusion, the remainder of the 1997 warrant provided probable cause and the information in it would inevitably have been discovered through independent means. We need not reach that argument given our conclusion that the 1995 search should not have been suppressed. The information from 1995 and thereafter provided sufficient probable cause.

Scott makes an independent argument that the affidavit was nonetheless materially misleading. We agree with the district court's reasoning that none of the claimed errors were material, none of the claimed omissions contradicted the sworn facts, and neither the errors nor the omissions affected the probable cause determination. The district court was therefore also correct to conclude that Scott had not made a sufficient showing to warrant a hearing

---

9. In *Ford*, we noted with approval a decision in the District of Massachusetts that examined the severity of the police misconduct involved. *See Ford*, 22 F.3d at 380 (citing *United States v. Rullo*, 748 F.Supp. 36 (D.Mass.1990)).

under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), which established the right to such a hearing for a defendant who shows some evidence of intentional or reckless material misrepresentation in the affidavit supporting a search warrant.[10] *See id.* at 171–72, 98 S.Ct. 2674 ("[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.").

Scott also argues that there was no probable cause to search his car, a Mercury Mountaineer, even if there was cause to search his house. As did the magistrate and the district court, we disagree. The warrant affiant had seen a three-inch-thick stack of documents in the back seat, hidden by a newspaper, and had seen other codefendants load things into the car. There was ample reason—especially in light of the 1995 search, which had revealed incriminating documents in the trunk of another of Scott's cars—to think the car was used to transport his runners and, likely, the documents essential to his trade. That is particularly so when the initial reasoning was that of an experienced field agent who had watched the growing sophistication of Scott's schemes over the years. The magistrate who issued the warrant was entitled to consider the agent's expertise. *United States v.*

*Zayas–Diaz*, 95 F.3d 105, 111, 116 (1st Cir.1996).

## B. *Evidentiary Rulings*

We review a district court's decision to admit or to exclude evidence for abuse of discretion. *United States v. Gilbert*, 181 F.3d 152, 160 (1st Cir.1999). Even if we find error, we will not reverse if the error was harmless—that is, if it is highly probable that the error did not contribute to the verdict. *United States v. Tse*, 135 F.3d 200, 209–10 (1st Cir.1998). If, moreover, the defendant failed at trial to object to introduction of the evidence, we review only for plain error. *United States v. Moore*, 923 F.2d 910, 915–16 (1st Cir. 1991).[11]

### 1. *Other Crimes*

The jury heard evidence of other crimes or possible crimes Scott committed on four occasions. Litigants may not use such evidence to prove that a person was of bad character and acted in conformity with that character. Fed.R.Evid. 404(b). They may, however, use the same evidence to prove other facts at issue in the case, including "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* This list illustrates, but does not exhaust, permissible purposes for such evidence. *E.g., Udemba v. Nicoli*, 237 F.3d 8, 15 (1st Cir.2001) (permitting the use of such evi-

---

**10.** For example, Scott claims that the affidavit misrepresented the precise time during which a codefendant was incarcerated and the precise date on which the Texas bank account became active. He also claims that the affidavit omitted information about the lack of evidence found on Scott's computers in earlier searches, an earlier suppression order regarding the evidence from the 1995 search, and what he maintains was the lack of evidence from IRS surveillance of Scott in 1997. Particularly in light of our holding on the inevitable discovery of the evidence from the

1995 search, which supplied substantial evidence linking Scott to the tax fraud scheme, the errors are minor and the omissions irrelevant.

**11.** The government disputes whether Scott properly objected to some of the evidence at stake in this appeal. With one exception, noted below, we assume that Scott's objections were proper, as the district court's rulings all survive review for abuse of discretion.

dence to show "the extent of damages attributable to emotional distress").

■ On none of the four occasions did the district court err. First, Brogan testified that he arrested Scott and Stephens in 1995 and described what he found in Scott's car. As Scott was accused of conspiring with Stephens, the evidence was relevant to show "the background, formation, and development of the illegal relationship" between the two. *United States v. Varoudakis*, 233 F.3d 113, 118 (1st Cir. 2000) (quoting *United States v. Escobar-de Jesus*, 187 F.3d 148, 169 (1st Cir.1999)). Furthermore, the district court gave a cautionary instruction that the evidence was meant to put other evidence in context, directing the jury not to speculate as to the reasons for the arrest and telling it that the arrest had "nothing to do with this indictment." There was no error.

■ Second, Charles Lynch, the facility manager at Coolidge House, a federal halfway house in Boston, testified that Scott had been a resident there, which meant that Scott had previously been an inmate in the federal prison system. Coolidge House was close to several ATM machines, and those machines were used to withdraw money from the USAA Federal Savings Bank account used in the scheme—in one instance, only a few minutes after Scott had signed out of the house. The evidence was relevant and admissible under Rule 404(b) because it showed Scott's opportunity to make withdrawals from the bank account, which linked him to the fraudulent tax returns. Also, the district court mentioned this evidence in its cautionary instruction. There was no error.

■ Third, the government introduced over objection two tax returns in the names of Robert Maguire and David Schmidt, which were not charged in the indictment. Other evidence tied those two returns to the returns which were the subject of the indictment. The filing fees for the Maguire and Schmidt returns were paid using the same credit card used to pay the fee of one indicted false return; furthermore, Scott tried to eliminate those charges from the credit card account. The evidence tended to show Scott was in control of the scheme. There was no error in its admission.

Fourth, Sonia Subia, a records custodian from the USAA Bank, testified as to various deposits into the Barnes USAA account. Subia's testimony included a reference to four deposits of Massachusetts tax refunds. Scott did not then object; the following morning, he objected that the reference was erroneously admitted because the government had not listed those accounts in its 404(b) letter. The government then explained that it did not mean to argue that those returns were necessarily fraudulent; rather, regardless of any fraud, their mere existence showed Scott's control of the scheme and the instrumentalities of the scheme. The district court found the matter too peripheral to warrant a special jury instruction. Although a special instruction might have been proper had Scott's initial objection been timely, the court neither plainly erred by failing to give one on its own motion nor abused its discretion by refusing one the next day. There was no error.[12]

---

12. The district court also admitted an IRS Circular E, Employer's Tax Guide found in the 1997 search of Scott's apartment; Scott claims that the guide was irrelevant because it was for the year 1997, and the conduct with which he was charged concerned the year 1996. The government maintains that the guide was published in 1997 but contained withholding rates for the year 1996. In either event, the guide was relevant to show Scott's understanding that plausible false tax returns required accurate rates, and it was hardly a

## 2. *Opinion Testimony Identifying Handwriting*

■ The final evidentiary challenge is more serious. James Donahue, an IRS agent, testified that certain documents in evidence were in Scott's handwriting. Donahue had followed Scott through a number of IRS investigations over a number of years, beginning when Donahue participated in the 1989 search. Donahue testified on voir dire that during this time he had seen examples of Scott's handwriting that included three to five letters, five to ten court pleadings, signature cards to open three bank accounts in Scott's name, fifty or sixty checks and deposit slips for those accounts, five to ten money orders, applications to file tax returns electronically, two driver's licenses, a pilot's license, and five to ten forms Scott had signed as part of booking procedures at police stations, among others. Donahue also saw Scott sign a document in his presence: a fingerprint card at the marshal's office during an earlier investigation.

Scott made two objections to Donahue's testimony as a whole, which he renewed after the voir dire. First, he objected that Donahue had acquired familiarity with Scott's handwriting "for purposes of the litigation," and thus could not testify as a lay witness under Federal Rule of Evidence 901(b)(2). Second, he objected that despite Donahue's exposure to Scott's handwriting Donahue nevertheless lacked sufficient familiarity with that handwriting to testify. The district court overruled Scott's objections, but required Donahue to refer to the documents in general terms in order to avoid undue prejudice to Scott. The jury was not told that the documents providing the basis for Donahue's familiarity came from earlier investigations, arrests, and seizures.

Donahue then identified Scott's signature and handwriting on various documents which the government had previously introduced as found in Scott's possession. These documents included a birth certificate in the name of Ralph Swoboda, a list of names, which included Scott's codefendants, the purported signature of Randy LaPlante on Western Union forms, an application for a copy of Daniel Richard Brogan's birth certificate, and similar papers. To some of these Scott objected on an individual basis as unduly prejudicial under Federal Rule of Evidence 403; to others, he did not. The district court overruled all such objections.

In admitting the testimony, the district court relied on Federal Rule of Evidence 701, which reads:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed.R.Evid. 701. The district court distinguished Rule 901 as dealing only with authentication as a condition precedent to the admissibility of evidence, and therefore not with evidence that had already been admitted. The court reasoned in the alternative that if Rule 901 did apply, Rule 901(b)(2) (on which Scott relied) would nevertheless permit admission. The Rule states:

> By way of illustration only, and not by way of limitation, the following are examples of authentication or identification

ripple amidst the waves of evidence against  Scott.

conforming with the requirements of this rule:

.        .        .        .        .

(2) Nonexpert opinion on handwriting. Nonexpert opinion as to the genuineness of handwriting, based upon

familiarity not acquired for purposes of the litigation.

Fed.R.Evid. 901(b).

Scott argues primarily that the correct rule for considering admissibility of such handwriting authentication or identification evidence is Rule 901(b)(2), and that the evidence was inadmissible because Donahue came to know Scott's handwriting through his criminal investigation of Scott.

Rule 901(b) illustrates two ways of authenticating or identifying through the testimony of a witness the handwriting on a document as being written by a particular person. The handwriting may be identified through a lay witness who has familiarity with the alleged author's handwriting and who did not acquire that familiarity for purposes of the litigation. Fed.R.Evid. 901(b)(2); *United States v. Tipton*, 964 F.2d 650, 655 (7th Cir.1992) (surveying cases). Alternatively, the handwriting may be identified as the alleged author's handwriting by an expert, who lacks such familiarity except as acquired for purposes of the litigation but has the requisite expertise and who compares the sample with specimens which have been authenticated.[13] Fed.R.Evid. 901(b)(3); *see also* Fed.R.Evid. 901(b)(2)

advisory committee's note ("Testimony based upon familiarity acquired for purposes of the litigation is reserved to the expert....").

The district court ruled that Rule 701 governed and that Rule 901 did not apply.[14] This is an issue of law we review de novo. We hold that both rules must be satisfied.

The essence of the district court's reasoning was that the documents that contained the handwriting had already been admitted into evidence. As such, they had, of course, been authenticated or identified. Fed.R.Evid. 901(a). Authentication refers to evidence that tends to prove that a document is what its proponent claims it to be. The documents were earlier authenticated as documents found in the search of Scott's car or home, and admitted as such. The handwriting on those documents was not previously authenticated as evidence that tended to prove that the handwriting was Scott's. To prove that point, the evidence had to comply with Rule 901.[15]

Whether Donahue's testimony satisfied Rule 901 depends on the purpose of the requirement that the familiarity of a lay opinion witness with handwriting may not be "acquired for purposes of the litigation." This limitation is properly understood in light of the common law tradition with which Rule 901(b)(2) and Rule 901(b)(3) break. English courts, and early American courts, placed strict limits on testimony concerning identification of handwriting by its style, called "compari-

---

**13.** Alternatively, the trier of fact may do this directly. Fed.R.Evid. 901(b)(3).

**14.** There may be situations in which Rule 901(b)(2) is satisfied, but Rule 701 is not—that is, in which an identification might not be helpful to the jury even though based on properly acquired familiarity.

**15.** An alternate rationale would lead to the same result: even if Donahue's testimony was not authentication within the meaning of Rule 901, we think that Rule 701's requirement that lay opinion testimony be helpful to the jury would be best read in light of the limits Rule 901(b)(2) places on lay opinion testimony regarding handwriting.

son of hands." 7 J. Wigmore, *Evidence* § 1991, at 253 (Chadbourn rev.1978). Professor Wigmore explains that when this rule was at its strictest, no witness was permitted to identify handwriting in a criminal case unless the witness had seen the document in question written or signed. Over time, however, courts came to permit handwriting identification based on ever-looser degrees of familiarity: one who had seen the alleged author sign other documents, or one who had seen samples of writing known to be by that author over a period of time, could give such testimony. *Id.* §§ 1992–1993, at 257–62.

Rule 901(b)(2) retains only one vestige of the common law rule. A lay witness may not enter court, see for the first time two samples of handwriting, and identify the contested sample as written by the same person as the previously authenticated sample; the result is the same, moreover, if the witness compared the two samples before entering the courtroom. *See, e.g., United States v. Pitts,* 569 F.2d 343, 348 (5th Cir.1978) (affirming the exclusion of the testimony of a lawyer-witness who had compared a single contested sample of handwriting to a single authenticated one in preparing for a previous trial). After all, such a comparison could be made as easily by the jury as by the witness. Therefore, lay witness testimony without familiarity would not be helpful to the jury and would be prohibited by Rule 701 even if Rule 901 did not exist. *Cf.* Wigmore, *supra,* § 1993, at 260 (observing that the common-law opinion rule would preclude lay witness testimony without familiarity).

This case involves no such situation. Donahue became familiar with Scott's handwriting over the course of several years, and he did so not for the purpose of testifying, but instead for the purpose of solving a crime. Scott was perfectly entitled to argue to the jury that Donahue's interest in securing a conviction colored Donahue's perception of Scott's handwriting. *Cf. Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (discussing in another context the pressures facing those "engaged in the often competitive enterprise of ferreting out crime"). That possibility, however, did not require the district court to exclude the evidence under Rule 901(b)(2).

We may dispense quickly with Scott's remaining objections to Donahue's testimony. Scott makes a different argument that Donahue was not sufficiently familiar with Scott's signature to testify. This factbound ruling is reviewed for abuse of discretion. *Gilbert,* 181 F.3d at 160. It is true that Donahue conceded that he saw Scott sign his name only once. Other categories of experience can, however, demonstrate familiarity, such as seeing signatures on writings purporting to be those of the alleged author when the circumstances would indicate that they were genuine. 2 *McCormick on Evidence* § 221, at 42 (J. Strong ed., 5th ed.1999). The rule for which Scott seems to contend—not only a strict requirement that the witness see the alleged author in the act of signature, but also a further demand that this occur multiple times—is far too strict. *See United States v. Standing Soldier,* 538 F.2d 196, 202 (8th Cir.1976) (permitting authentication testimony on the basis of a single exposure to an uncontested signature and a single exposure to a contested one). In this case, there was enough familiarity on the part of the witness to admit the testimony. Scott's arguments go rather to the weight of the evidence. *Weinstein's Federal Evidence* § 901.04[2], at 901–20 (J. McLaughlin ed., 2d ed.2001). Scott took advantage of this, and cross-examined the agent on the paucity of actual sightings of Scott endorsing his signature. Accordingly, there was no abuse of discretion and no error.

■ Scott also argues he was prejudiced by the implicit message, conveyed by the use of an IRS agent to identify his handwriting, that the government had been investigating him for a long time and probably for other things. The district court admirably restricted direct testimony to this effect. Nevertheless, Scott would have us say that the remaining prejudice still substantially outweighed the probative value of the evidence so that the district court was bound to exclude the testimony under Rule 403. We cannot so hold. The district court's discretion in the Rule 403 balancing inquiry is broad. *E.g., Daigle v. Me. Med. Ctr., Inc.,* 14 F.3d 684, 690 (1st Cir.1994). Even if the government might have done better to use an expert witness for the handwriting identification, as Scott argues, and even if another district court might permissibly have excluded the evidence on this basis, the availability of a less prejudicial method of proof is only a factor to be weighed in the Rule 403 inquiry and does not control this case. *See* Fed.R.Evid. 403 advisory committee's note ("The availability of other means of proof *may also* be an appropriate factor.") (emphasis added); *see generally Old Chief v. United States,* 519 U.S. 172, 180–92, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (discussing the proper analysis of less prejudicial methods of proof). In light of its careful attention to the problem of prejudice, the district court did not abuse its discretion by admitting the evidence under Rule 403.[16]

## C. *Sentencing Issues*

### 1. *Leadership Role in the Offense*

■ The district court's conclusion that Scott played a leadership role and its enhancement of his sentence under USSG § 3B1.1 rest largely on the facts of the case and we therefore review for clear error. *United States v. Graciani,* 61 F.3d 70, 75 (1st Cir.1995); *see also United States v. Wright,* 873 F.2d 437, 443–44 (1st Cir.1989) (discussing the rationale for reviewing §§ 3B1.1 and 3B1.2 determinations for clear error).

A leadership enhancement is warranted if the criminal activity involves five or more participants and the defendant was a leader or organizer. The commentary to the Sentencing Guidelines lists seven pertinent factors in the analysis: (1) "the exercise of decision making authority"; (2) "the nature of participation in the commission of the offense"; (3) "the recruitment of accomplices"; (4) "the claimed right to a larger share of the fruits of the crime"; (5) "the degree of participation in planning or organizing the offense"; (6) "the nature and scope of the illegal activity"; and (7) "the degree of control and authority exercised over others." U.S. Sentencing Guidelines Manual § 3B1.1 cmt. 4 (2000).

The district court found that:

[I]t is clear that the instrumentalities were under Mr. Scott's control; the techniques and the approach was something he was familiar with; the evidence was that he was behind it and recruited the people; the connection with many of the people, including members of his own family, as the sources of names for, for the people in whose names the false returns would be filed, and so on; people that crossed Mr. Scott's path. There's just a great deal of evidence

---

16. Scott's reply brief appears to raise the further question whether Donahue's testimony should have been treated as expert testimony and assessed under Rule 703. This argument was made neither to the district court nor in Scott's main brief to this Court. As a result, it is waived. To the extent Scott seeks merely to bolster his attack on Donahue's testimony by minimizing its probative value, our discussion in the text disposes of the matter.

that he was the animating force behind this.

Based on the evidence to which it refers, the district court stated that "without rehearsing all the factors" it would "infer that Mr. Scott was an organizer or leader within" the meaning of § 3B1.1. These words, following a detailed discussion of the factors by counsel, demonstrate that the district court had the correct standard in mind. Moreover, the court did not clearly err in applying that standard to the facts of this case. On these facts, Scott apparently had control over the bank account where some of the refund checks were deposited; he is the one who received the rebates on software which most likely were used for the crime; he had the pertinent lists and equipment; and he transported the runners. The court reasonably inferred from these indicia of control that Scott's role in the offense was executive rather than merely ministerial.[17]

2. *Restitution*

■ The district court determined that the government lost a net amount of $37,970.68 from the fraudulent tax returns and ordered Scott to pay this full amount in restitution. It also ordered codefendant Morrison to pay $8,253.00 and codefendant Stephens to pay $7,479.00. Scott and the government agree on appeal that any restitution obligation imposed on Scott and his codefendants should not exceed the amount of the government's loss. Accordingly, they suggest a remand to clarify that the restitution obligation is "joint and several," although Scott would have us vacate the entire order and the government would have us affirm the amount.

A moment to clarify the correct result and terminology may avoid future confusion. When more than one defendant causes a loss to a victim, the district court may within its discretion "make each defendant liable for payment of the full amount of restitution or ... apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h) (Supp. II 1996). If the defendants are each made liable for the full amount, but the victim may recover no more than the total loss, the implication is that each defendant's liability ends when the victim is made whole, regardless of the actual contributions of individual defendants—a rule that corresponds to the common law concept of joint and several liability. *Cf. Tilcon Capaldi, Inc. v. Feldman,* 249 F.3d 54, 62 (1st Cir.2001) (defining joint and several liability to mean "that damages are a single sum specified in the judgment, that each wrongdoer is liable for the full amount, but the wronged party cannot collect under the judgment *more* than the single sum"). Indeed, the legislative history for this provision states that it "gives the court the discretion either to make multiple defendants jointly and severally liable ... or to apportion the restitution order among the various defendants." S.Rep. No. 104–179, at 15 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 928.

In this case, however, the court did not make the defendants liable for the full amount. Rather, our reading of the district court's restitution order is that the government may hold any individual de-

---

17. Scott also incorporates into his appeals of the sentences based on the 1998 convictions his argument from the appeals of the sentence based on the 1999 convictions, Nos. 00–1767 and 00–1669, regarding the use in sentencing of a certain prior conviction. Scott claims that the Commonwealth obtained the prior conviction in violation of his Sixth Amendment right to the assistance of counsel. We reject this argument for the reasons stated in section III.C of this opinion.

fendant liable for as much as the court ordered as to that defendant (that is, Scott for up to $37,970.68, Morrison for up to $8,253.00, and Stephens for up to $7,479.00), but that the government may not collect more from all defendants together than will make it whole (that is, a total of $37,970.68 in restitution for the crime). Rather than true joint and several liability, this type of liability is a creature of the restitution statute; such an order is within the district court's discretion. *See United States v. Trigg*, 119 F.3d 493, 500–01 & n. 6 (7th Cir.1997) (interpreting a prior version of the restitution statute, and noting that Congress had made the authority to impose joint and several liability if anything broader in the statute now at issue); *United States v. Harris*, 7 F.3d 1537, 1539–40 & n. 1 (10th Cir.1993) (interpreting the earlier statute); *see also United States v. Hunter*, 52 F.3d 489, 495 n. 3 (3d Cir.1995) (reserving the question).

We affirm the district court's order on our view that its natural reading is as we have described. It would be the better practice for district courts that intend to enter such an order to refer expressly to the limit placed on the government's total recovery, but in light of the statutory scheme we think the implied limit is not hard to find.

### III. *Automobile Bank Loan Fraud* Nos. 00–1767 and 00–1669

In 1999, under a conditional plea agreement, Scott pled guilty to one count of conspiracy to defraud, 18 U.S.C. § 371 (1994), and two counts of bank fraud, 18 U.S.C. § 1344 (1994). He received a 46 month sentence to be served consecutive to another sentence and was ordered to pay $35,500.00 in restitution. On appeal Scott raises three main claims: violation of the Speedy Trial Act, invalid search warrants, and incorrect sentencing. We find

that there was a violation of the Act, but that Scott is entitled only to a dismissal of the charges without prejudice.

### A. *Speedy Trial Act*

Scott's lead argument is that the indictment should have been dismissed for violation of the Speedy Trial Act ("STA"), 18 U.S.C. § 3161 *et seq.* (1994). Scott argues that the STA was violated because the trial court failed to dispose of his motion to suppress within 30 days of taking it under advisement, and failed to try him within 70 days, if the days the motion was under advisement, beyond the 30 days, are not excluded. The court, he says, retroactively held that there was no STA violation based on reasoning that it did not formally take the motion to suppress under advisement because it found later it needed other submissions to be filed in order to decide a small subset of issues.

Scott also argues that the remedy for the STA violation is that the indictment should be dismissed with prejudice because the offense is not serious, the trial court exceeded the statutory time to dispose of the motion, and the impact of reprosecution on the administration of justice and on the STA counsels against dismissal without prejudice.

### 1. *Compliance with the STA*

■ In enacting the STA, Congress imposed specific time limitations on the district courts in order to make the Sixth Amendment right to a speedy trial more effective. H.R.Rep. No. 96–390, at 2–3 (1979), *reprinted in* 1979 U.S.C.C.A.N. 805, 807. Thus, a defendant must be tried within 70 days of the filing of the indictment or the defendant's first appearance before a judicial officer, whichever occurs later. *Henderson v. United States*, 476 U.S. 321, 322, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986). However, not every day be-

tween the indictment or appearance and the trial counts toward the 70–day limit. The STA specifies a number of circumstances that can suspend the running of the time. 18 U.S.C. § 3161(h). We start with the facts needed to do the STA calculations.

Scott was indicted on March 25, 1999, and arraigned on April 14, 1999. On August 19, 1999, Scott moved to suppress all evidence seized in two searches, of his house on March 16, 1999 and of his computer on April 8, 1999. Scott argued that the searches were unlawful due to insufficient probable cause, lack of particularity, the search exceeding the scope of the warrant, and noncompliance with Federal Rule of Criminal Procedure 41. Scott argued the government could not rely on the plain view doctrine as to items seized beyond those described in the warrants. In its opposition to the motion, the government said that it would not offer most of the evidence to which Scott objected, and that it would offer only ten items on a plain view rationale. It provided no argument as to why those items fell within the plain view doctrine. In his reply, Scott conceded two of those ten disputed items were admissible, but disputed the remainder. He also pointed out that the government had failed to provide any specific argument as to the other eight items purportedly justified by the plain view doctrine.

At a pretrial conference in August 1999, a hearing on Scott's pretrial motion to suppress was set for September 16, 1999. On September 16, when the attorneys for both sides arrived in court for the hearing, they agreed to submit the motion on the filings because of inclement weather. At the brief court proceeding, the trial judge stated: "[i]f, as I wrestle with the papers, I think that I want to hear from anyone, you can be sure that I will schedule a hearing and not just go ahead on the paper record." The judge then concluded by stating that he would "take [the matter] under advisement on the record as it's been prepared." The court evidently concluded that a hearing was not required.

On January 18, 2000, 124 days after the September 16 proceeding, the district court issued a memorandum and order denying virtually all of Scott's claims in the motion to suppress. *United States v. Scott,* 83 F.Supp.2d 187 (D.Mass.2000). However, as to items the government proffered on the plain view doctrine, the court requested the parties to prepare a list of items disputed (although the effect of the prior filings was to do that), and to brief the admissibility of each one. *Id.* at 201. The district court thus seemed responsive to the argument defendant had made in his September 16 reply about the lack of item by item argument from the government. The court did not set any date for the additional filings to be made. As it turned out, by February, it became clear that no additional submissions from the parties were necessary because the government agreed it would not use any of that evidence.

Scott filed a timely motion to dismiss the indictment for violation of the Speedy Trial Act on March 8, 2000. The district court orally denied Scott's motion on March 22, 2000, justifying in STA terms the 124 days it had taken to decide the motion to suppress. The court reasoned that by stating that it might need additional submissions from the parties it made itself clear that the matter was not formally under advisement, despite its use of those very words at the conclusion of the September 16, 1999 proceeding. Therefore the entire period of time from the filing of the motion, to the hearing on that motion, to the partial decision on the motion, was, in the court's view, excludable under the STA. This is not a situation in which the district

court invoked the "ends of justice" rationale of 18 U.S.C. § 3161(h)(8). The district court was explicit that its only reason for denying the STA motion was that it requested further filings.

We review issues of law under the STA de novo and review factual determinations for clear error. *United States v. Rodriguez*, 63 F.3d 1159, 1162 (1st Cir.1995). In 18 U.S.C. § 3161(h), the STA outlines several situations in which time is excluded from the 70–day limit between the indictment or appearance of the defendant and the trial. For example, the time between the filing of a pretrial motion and the hearing on the motion is excludable: "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" is excludable. 18 U.S.C. § 3161(h)(1)(F).

▮▮▮ Once the motion is "actually under advisement," the trial court has up to 30 excludable days to decide it: "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court" is excludable. 18 U.S.C. § 3161(h)(1)(J). Normally this means that the court must decide the motion within 30 days after a hearing on that motion. *Rodriguez*, 63 F.3d at 1163. However, if the court requires further filings at the hearing, then the 30–day period runs from the date of the last filing. *Henderson*, 476 U.S. at 331, 106 S.Ct. 1871. If the matter is taken on the papers alone, a decision must be rendered within 30 days of the last submission. *United States v. Salimonu*, 182 F.3d 63, 68 (1st Cir.1999); *United States v. Barnes*, 159 F.3d 4, 11 (1st Cir.1998); *Rodriguez*, 63 F.3d at 1163; *United States v. Rush*, 738 F.2d 497, 505 (1st Cir.1984); *see also United States v. Wilson*, 835 F.2d 1440, 1442 (D.C.Cir.1987).

In *Henderson*, the Supreme Court that held subsections (F) and (J), read together, mean that the STA permits an "exclusion of up to 30 days while the district court has a motion 'under advisement,' *i.e.*, 30 days from the time the court receives all the papers it reasonably expects." 476 U.S. at 328–29, 106 S.Ct. 1871. As *Henderson* notes, subsection (F) controls two situations:

> The first arises when a pretrial motion requires a hearing: subsection (F) on its face excludes the entire period between the filing of the motion and the conclusion of the hearing. The second situation concerns motions that require no hearing and that result in a "prompt disposition." There, the promptness requirement was "intended to provide a point at which time will cease to be excluded, where motions are decided on the papers filed without hearing." S.Rep. No. 96–212, at 34. The "point at which time will cease to be excluded" is identified by subsection (J), which permits an exclusion of 30 days from the time a motion is actually "under advisement" by the court. Without the promptness requirement in subsection (F), a court could exclude time beyond subsection (J)'s 30–day "under advisement" provision simply by designating the additional period as time "from the filing of the motion" through its "disposition" under subsection (F).

476 U.S. at 329, 106 S.Ct. 1871.

▮▮▮ This case presents a hybrid situation. Although the motion to suppress was set for hearing on September 16, 1999, no hearing was actually held. Instead, the parties submitted on the papers, and the court explicitly took the matter under advisement. Thus, this could be viewed as a situation in which there was no hearing and so the requirement on the district court was one of "prompt disposition" of

the matter under subsection (F); it could also be viewed as "under advisement," and so subject to the 30–day limit for decision in subsection (J). *Henderson,* however, makes it clear that the difference does not matter to the time allowed—in either situation no more than 30 days are excluded: "[T]he phrase 'prompt disposition' was intended to prevent a district court from using subsection (F) to exclude time after a motion is taken under advisement when that time fails to qualify for exclusion under subsection (J)." *Id.*

The Supreme Court also noted that the Senate Committee on the Judiciary had explained:

> [I]n using the words "prompt disposition," the committee intends to make it clear that, in excluding time between filing and disposition on the papers, the Committee does not intend to permit circumvention of the 30–days, "under advisement" provision contained in Subsection (h)(1)(J). Indeed, if motions are so simple or routine that they do not require a hearing, necessary advisement time should be considerably less than 30 days.

*Id.* (quoting S.Rep. No. 96–212, at 34 (1979)).

*Henderson* also addressed the situation where the court determines that it needs additional submissions on a motion which required a hearing. The Court noted that the statute prescribes that "for motions decided solely on the papers, Congress has allowed exclusion of time during which the parties are filing their briefs." *Henderson,* 476 U.S. at 331, 106 S.Ct. 1871 (discussing subsections (F) and (J)). The same rule, the Court held, applies to exclude the period after the hearing when the court is awaiting additional briefing. *Id.*

Thus, the periods of exclusion under the Act which are unrestricted in time include the time between the filing of the motion and the hearing on the motion, and the period of time to obtain additional filings needed for disposition of the motion. *See Salimonu,* 182 F.3d at 67–69 (two-year delay in holding hearing is excludable time); *United States v. Staula,* 80 F.3d 596, 601 (1st Cir.1996) (STA excludes time between filing of motion and hearing on motion "even if the delay is overlong, inexplicable, or unreasonable"). Once the additional filings are submitted, and a hearing is not required, the court must decide promptly, within 30 days.

The closest case we can find to our situation is *United States v. Janik,* 723 F.2d 537 (7th Cir.1983). There, the trial court took a pretrial motion under advisement (after post-hearing motions), kept it under advisement for more than three months and then said it needed additional filings. *Id.* at 543. The court rejected the argument that the entire period was excludable: "the requirement of prompt disposition in section 3161(h)(1)(F) may not be circumvented by ... ordering the hearing reopened more than 30 days after the matter has been taken under advisement." *Id.* at 544. We agree.

The STA makes no provision for what the district court did here: not decide the motion for 124 days and then retroactively seek to explain the lack of prompt disposition by saying it needed additional filings, although it had taken the matter under advisement earlier. Nor does the STA make any provision for a district court effectively to take a matter under advisement for decision, but then to avoid the STA timeline by saying that matter was not under advisement within the meaning of the Act. We do not think the STA permits either course of action. Such an approach would undermine the purposes of the Act.

Congress plainly wanted even more complicated motions than the one here to be decided within 30 days of a hearing, and less complicated motions, decided without a hearing, to be decided "promptly," within that 30–day period. Congress was also concerned about holding the district courts to the STA framework and avoiding loopholes. That concern has been shared by the circuit courts. *See United States v. Grosz*, 76 F.3d 1318, 1325 n. 7 (5th Cir. 1996); *United States v. Moran*, 998 F.2d 1368, 1371–72 (6th Cir.1993); *United States v. Brenna*, 878 F.2d 117, 122 (3rd Cir.1989) (per curiam); *United States v. Crane*, 776 F.2d 600, 606–07 (6th Cir.1985); *United States v. Tunnessen*, 763 F.2d 74, 77 (2d Cir.1985); *United States v. Tibboel*, 753 F.2d 608, 611 (7th Cir.1985); *United States v. Carey*, 746 F.2d 228, 230 (4th Cir.1984); *United States v. Frey*, 735 F.2d 350, 353 (9th Cir.1984); *United States v. Richmond*, 735 F.2d 208, 216 (6th Cir. 1984); *Janik*, 723 F.2d at 545; *United States v. Gonzalez*, 671 F.2d 441, 444 (11th Cir.1982). In *Staula*, this Circuit also warned that it would "not permit ... the district court ... to jerry-build a 'hearing' in order to thwart the concinnous operation of the Speedy Trial Act." 80 F.3d at 602 n. 3.[18]

We realize our holding may pose practical problems for a trial judge who after taking a motion under advisement decides that additional filings are required. The answer inherent in the structure of the STA is that the judge must pay prompt attention to the materials that have been filed with the motion. A hearing date need not be scheduled until the court has had the opportunity to review the materi-als and to determine if additional filings are needed. That should, in most instances, avoid the problem presented here.

Still, it is possible that a judge in good faith does not reach the conclusion that additional filings are required to decide a motion until he or she works on the motion after it is taken under advisement. Nonetheless, Congress has imposed a 30–day rule for the decision of motions. One would expect a court working under a 30–day limit to identify the need for additional filings early in that period and so notify the parties. Under those rare circumstances, excluding the period of time between the request for additional filings and the receipt of those filings would be permissible, but the time involved in deciding the motion would remain 30 days. In some situations, some further exclusion might be in order, in the form of tolling the 30–day period.[19]

By this holding, we do not adopt a flat rule that a district court may never exceed the time limits in the STA and then justify it after the fact. Some future set of facts, perhaps involving an express and proper invocation of 18 U.S.C. § 3161(h)(8), may support such an action. However, the disciplines of the time limits in the STA are better maintained by explanations given before the clock runs out.

### 2. *Remedy for STA Violation*

This leaves the question of the appropriate remedy for the STA violation: dismissal of the charges against Scott without prejudice (so the government may proceed again) or with prejudice (foreclosing new

---

**18.** This Circuit has expressed similar concerns about the dangers of potential abuse of the STA when the government causes the delay by not filing its opposition to motions on the due date. *Rodriguez*, 63 F.3d at 1165.

**19.** This case does not involve, and so we do not address, the Seventh Circuit's rule in *Tibboel*, 753 F.2d at 611–12, that the promptness requirement may extend beyond 30 days when the district court is faced with multiple motions at once.

proceedings). This Court may, in its discretion, decide the question itself or remand the question to the district court. *Barnes*, 159 F.3d at 16. In this case, we think it is quite clear that the dismissal should be without prejudice and see no reason to remand.[20] In addition, the determination of this issue by this Court would further the goals of judicial economy, and better serve the purposes of the STA—protecting both defendants' rights to, and the public's interest in, the swift administration of justice. H.R.Rep. No. 96–390 at 3, *reprinted in* 1979 U.S.C.C.A.N. at 807.

In deciding whether the dismissal should be with or without prejudice, the STA directs the court to consider at least three factors: (1) the seriousness of the offense; (2) the facts and circumstances of the case which led to the dismissal; and (3) the impact of reprosecution on the administration of justice and on the administration of the STA. 18 U.S.C. § 3162(a)(2); *see United States v. Hastings*, 847 F.2d 920, 925–29 (1st Cir.1988). In *Barnes*, this Court added a fourth factor to the nonexclusive list outlined in the statute itself: whether the delay resulted in actual prejudice to the defendant. 159 F.3d at 16.

■■■ First, Scott's offense was serious. Bank fraud is a serious offense which carries with it a maximum sentence of 30 years' imprisonment under 18 U.S.C. § 1344. Second, the facts and circumstances of the delay do not show any bad faith on the part of the government. The delay was largely due to the district court, which acted without clear guidance by the law on the point.

Third, the impact of reprosecution on the administration of justice and on the

STA does not call for dismissal with prejudice. It is clear that whenever the STA's requirements are not met, "the administration of justice is adversely affected." *Hastings*, 847 F.2d at 926. The STA nevertheless asks the courts to consider the degree to which the administration of justice is harmed. Here, taking Scott's case through the justice system again would probably not take a long time. Scott, after all, filed a conditional guilty plea to the indictment before he pursued this appeal based on a STA violation. There are also no indications that reprosecution in this case would in some other way have a harmful effect on "the fair and efficient administration of justice." *Barnes*, 159 F.3d at 17. Similarly, the impact on the administration of the STA also counsels against dismissal with prejudice. There is no question that a dismissal with prejudice would have a stronger deterrent effect than a dismissal without prejudice. However, the fact that there is a dismissal at all is deterrence enough in this case.

Finally, the delay resulting from reprosecution will not prejudice Scott. Scott has not yet begun to serve his sentence on this case, because it is to be served consecutively to his 96–month sentence on other indictments. Scott has also never asserted that the delay has adversely affected his ability to prepare for trial. For all these reasons, the charges against Scott will be dismissed without prejudice.

Although the charges against Scott in this case must be dismissed without prejudice, it is likely the charges will be brought anew and the remaining issues recur. For this reason, we deal with the remaining issues presented by the appeal.

---

**20.** In its oral decision of the motion to dismiss for lack of speedy trial, the district court noted that if there was a STA violation, the remedy should be dismissal without prejudice.

## B. Search Warrant Issue

Scott argues that the trial court erred when it denied his motion to suppress evidence by finding there was probable cause to issue two search warrants. Scott claims, inter alia, that there was insufficient cause to issue the first warrant to search his residence. He argues the warrant was based only on information from unreliable confidential informants where such information was insufficiently corroborated. Specifically, Scott says that the information was corroborated only as to innocent details, and the informants' own bad deeds. He also claims that an unreliable informant was used for cross-corroboration purposes. Scott argues that the affidavit that supported the search warrant did not create a nexus that probable cause existed that evidence of the alleged crime would be found at his residence, and that the search warrant was overly broad because it amounted to a general warrant that far exceeded the scope of probable cause.

In addition, Scott argues that the trial court erred by finding probable cause to seize his computers. He says the finding of probable cause was based on allegations of bank fraud where the affidavit in support of the warrant did not demonstrate an evidentiary nexus between the computers and the allegations of bank fraud. He also claims that the finding of probable cause was based on uncorroborated statements of unreliable informants.

We have considered these arguments and they are without merit. The district court opinion, *Scott*, 83 F.Supp.2d at 190–201, details the reasons why probable cause was present, and we see no need to add to the discussion. The district court's denial of the motion to suppress was correct.

## C. Sentencing

As to sentencing, Scott claims the trial court erred in sentencing him based on an erroneous Criminal History Category. He objects that his Criminal History Category ("CHC") of VI was impermissibly based on an uncounseled state felony conviction. If this conviction is not used, his CHC drops to V, so that his sentence would fit within a range of 33 to 41 months. Scott relies on the fact that no waiver of counsel form was found in Scott's state court record. The trial court found that Scott had waived counsel in the state criminal case and that, even if not, it would have departed upward in any event to reach 46 months.

Scott shortchanges the district court's reasoning. Scott was no stranger to criminal proceedings at the time of his state conviction, and it is not credible that he did not know of his right to counsel. Also, there is a record of Scott being represented by counsel in the state court case immediately after his plea. The district court reasoned that it was more plausible that Scott waived counsel and the form evidencing it was inadvertently not in the file, than that Scott was denied his right to counsel. Scott did not introduce evidence that he was unrepresented by counsel, but simply relied on the lack of evidence that he was. *See United States v. Cordero*, 42 F.3d 697, 701–02 (1st Cir.1994) ("In the absence of specific evidence, the court below had a right to treat the disputed conviction as constitutional and give it weight in constructing appellant's sentence."). In these circumstances, the district court's conclusion cannot be called clear error, if error at all.[21]

21. Scott also argues that the sentence was illegal because the trial court ordered restitution from Scott and a codefendant that would, if each paid the full amount ordered, exceed the actual loss by $17,750.00. Scott's arguments in this respect are identical to those we

## IV. *Conclusion*

We affirm on all issues in Appeals Nos. 99–2236, 00–1379, 00–2350, and 00–1381. In Appeals Nos. 00–1767 and 00–1669, we conclude that Scott's Speedy Trial Act rights were denied and that the action must be dismissed without prejudice. We therefore reverse Scott's convictions in the 1999 case, vacate his sentence, and remand Appeals Nos. 00–1767 and 00–1669 for proceedings consistent with this opinion.

*So ordered.*

have dealt with in his appeals from the 1998 convictions, Nos. 99–2236, 00–1379, and 00–2350. As we have stated in subsection II.C.2 of this opinion, we would affirm the district court's restitution order as entered were the question presented.