# United States Court of Appeals
## For the First Circuit

---

No. 09-1529

UNITED STATES,

Appellee,

v.

DARREN FRANKLIN,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya Zobel, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Howard and Thompson, Circuit Judges.

---

Jonathan Shapiro, with whom Alexandra Deal was on brief, for appellant.
Scott A. C. Meisler, Criminal Division, Appellate Section, United States Department of Justice, with whom Carmen M. Ortiz, United States Attorney, Thomas E. Kanwit, Assistant United States Attorney, Lanny A. Breuer, Assistant Attorney General, and Greg D. Andres, Acting Deputy Assistant Attorney General, were on brief, for appellee.

---

January 5, 2011

---

**THOMPSON**, **Circuit Judge**. Following a comprehensive investigation into the organized drug trade in a blighted neighborhood of Boston, a jury convicted Darren Franklin of several charges stemming from the sale of crack cocaine and the possession of both drugs and ammunition. On appeal, Franklin seeks to overturn those convictions, alleging an illegal search and an overly long time to trial. After careful consideration, we agree with the district court's disposition of both issues. We affirm.

## BACKGROUND

**Drugs and Ammunition**

In 2003, federal, state, and local authorities began conducting a coordinated investigation of the drug trade around the Warren Gardens housing complex in the Roxbury section of Boston.[1] Franklin's reputation as a mid-level supplier of crack cocaine to street dealers led law enforcement to peg him as a primary target. Looking to nab the cautious Franklin on concrete charges, law enforcement set up two controlled buys of crack cocaine.

The first controlled buy occurred on July 10, 2003. On Copeland Street in Roxbury, an undercover Boston police officer approached a street dealer from whom he had previously purchased crack cocaine. Queried about the availability of crack cocaine,

---

[1] Authorities involved in the investigation included the Boston Housing Police, the Boston Police (specifically the Youth Violence Task Force, or gang unit), the Massachusetts State Police, the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives, and the United States Drug Enforcement Administration.

the dealer shook hands with the officer, told him to sit on a nearby set of stairs, and then walked over to a dark-colored minivan. The dealer spoke with two individuals in the van, one of whom was later identified as Franklin. Apparently fearful of surveillance — rightly so, given that the Copeland Street interactions were being recorded on video — Franklin told the dealer to move to a more discreet location before consummating the deal. The officer and the dealer crossed Warren Street and ended up on Rockland Street in the Warren Gardens complex, where (a detective would later testify) it is nearly impossible to conduct surveillance. The van arrived at Rockland Street moments later. The dealer approached the van, and Franklin passed a plastic bag to the van's other occupant, who then handed the bag to the dealer through the van's open window. The dealer removed a rock-like material from the bag, cut off a chunk, and handed it to the officer. In return, the officer gave $150 to the dealer, who then got into the van's back seat. As the van pulled away, the officer saw the dealer pass the money to Franklin. The chunk of rock-like material was later determined to contain a net weight of 1.3 grams of crack cocaine.

The second controlled buy took place on March 12, 2004. This time, law enforcement employed a confidential informant ("CI") to arrange a more substantial purchase from Franklin — the goal was an ounce, or roughly 28 grams of crack cocaine. With an officer

-3-

present, the CI twice tried to reach Franklin by phone before he called her back. The CI and Franklin arranged a deal to take place at the Presidential Acres apartment complex in Randolph, Massachusetts, where Franklin's mother lived. Specifically, the CI asked for "a full one" — referring to an ounce — which Franklin said he'd sell her for "a G" — referring to $1000. Officers searched the CI and her vehicle and found no drugs or money; they then provided her with $1000 in government money and placed a radio transmitter in her vehicle, on the driver's side visor.

The CI traveled to the appointed location in Randolph and parked by the pool. Officers were posted at various places around the apartment complex, monitoring audio from the CI's vehicle and recording video of Franklin. The officers' surveillance revealed that Franklin exited his mother's apartment, got into a brown vehicle, and drove to meet the CI by the pool. Franklin got out of his vehicle and into the CI's. The two of them conversed for a couple of minutes, and then Franklin got back into his vehicle and left. The CI also drove away, followed by a DEA agent. About a mile away from the apartment complex, the CI and the agent pulled over, and the CI handed over to the agent bags containing a rock-like substance. The rock-like substance was later determined to contain a net weight of 26.5 grams of crack cocaine.

On April 14, 2004, the government was ready to move in on Franklin: a grand jury returned an indictment charging him with

three counts of cocaine possession with intent to distribute, and the court issued a warrant for his arrest. That very night, Detective Robert Fratalia set up a post at 159 Pine Grove Drive in Brockton, Massachusetts, where Franklin was living with then-girlfriend Fania Hemingway and her two children. Fratalia surveilled both the apartment complex's courtyard and a blue Ford Taurus sedan that was registered to Franklin's mother and that he had previously seen Franklin drive. Detective (and deputized federal agent) George MacLaughlin and Agent Michael Cashman were also posted separately nearby.

At around 11:30 p.m., an individual fitting Franklin's description — a black man, around 30 years old, six feet tall or so, and probably 270 or 280 pounds — emerged from the courtyard and got into the front seat of a white sedan, which then drove away. The car returned about half an hour later, and the individual headed into the courtyard and out of Fratalia's sight. About an hour after that, the same individual emerged again, this time carrying a shopping bag, which he placed in the trunk of the blue Ford Taurus sedan. He got into the Taurus's driver seat, started the car, and began to pull away but stopped almost immediately; then he waited a couple of minutes, got out of the car, locked it, and returned to the courtyard.

By around 5:30 a.m. on April 15, 2004, a SWAT team had arrived to arrest Franklin, who (law enforcement had reasonably

concluded) was the individual Fratalia had observed. The team surrounded the apartment complex. Officer Brian Cahoon, a member of the SWAT team, used a cell phone to call into Franklin's apartment. Hemingway answered the phone and then passed it to Franklin. Cahoon told Franklin that the apartment was surrounded, so Franklin prepared to surrender: he got dressed, gathered his phone, his keys, and some loose cash, and then came out carrying a plastic bag full of ammunition. He was directed to leave his belongings on the ground and to crawl on all fours toward nearby officers; he was then placed in plastic cuffs and taken into custody.

Franklin was brought to MacLaughlin and Cashman, who introduced themselves and advised him of his <u>Miranda</u> rights. Franklin said he understood. By all accounts, the agents told Franklin that he had been observed placing a plastic bag in the trunk of the blue Ford Taurus. Here, however, the record diverges a bit.

According to Cashman, the agents asked Franklin if he would consent to a search of the car. Franklin skirted the issue by responding that the car was his mother's. Cashman then asked him what was in the plastic bag; Franklin said it was a little weed. Cashman followed up by asking why he had placed a little weed in the car; Franklin said he had heard that his people were getting arrested, and he wanted to protect his girlfriend by

removing any contraband from the apartment. Having secured this information, Cashman repeated his initial request that Franklin consent to a search of the car. Franklin replied, "Yeah, do what you got to do." Cashman testified specifically that the agents did not tell Franklin that they would get a warrant to search the car if he did not consent.

According to MacLaughlin, the conversation went more or less as Cashman testified. Under MacLaughlin's version of events, however, Franklin only explained why he had placed the marijuana in the trunk of the Taurus — to protect his girlfriend — after telling the agents to "do what you got to do."

According to Franklin, however, the agents first asked him what he had been doing in the car at night. Franklin told them that he "was just going out to my car to smoke some weed." They asked what was in the bag that he had placed in the trunk. He replied, "some sneakers." Then the agents asked whether they could search the car, to which Franklin replied, "no." After conferring with one another, the agents asked Franklin whether the car was his mother's. He replied that the car was his but was registered to his mother. Stymied, McLaughlin said, "Well, you know we could tow the car until we get a search warrant." Only at this point did Franklin offer the response that the officers took as consent: "Well, do what you got to do then."

On the basis of Franklin's apparent consent, McLaughlin retrieved the keys to the Taurus from Hemingway. The agents searched the car, finding a bag in the trunk. The bag contained a shoe box, the shoe box contained a smaller bag, and that bag contained 66 grams of crack cocaine and 91 grams of marijuana.

**Pretrial Procedural Hiccups**

On April 20, 2004, Franklin entered a plea of not guilty, and on October 14, 2004, he moved to suppress the fruits of the agents' search of the car, arguing that he had not actually consented to the search. Franklin also requested an evidentiary hearing on the issue. The government opposed the motion and argued that there was no need for a hearing.

In the meantime, on October 28, 2004, Franklin was also indicted on another possession-with-intent-to-distribute charge, this time stemming from the drugs the agents found in the car; the new indictment also added a felon-in-possession-of-ammunition charge. Franklin entered a plea of not guilty to the additional counts in the superseding indictment.

In January 2005, the district court first addressed the motion to suppress, suggesting that there was no real need for an evidentiary hearing. Eight months later, however, the court granted the request for a hearing, which took place over three days

in November and December 2005.[2]  In early March 2006, having received no ruling from the district court, Franklin filed a motion to dismiss the indictment for violation of the Speedy Trial Act, 18 U.S.C. § 3162.

Finally, on March 15, 2006 — nearly a year and a half after Franklin filed his suppression motion — the court denied the motion on the alternate grounds that Franklin had given consent or that the officers had probable cause to conduct the challenged search.  Two days later, the court denied the motion to dismiss, finding no violation of the Speedy Trial Act.  However, following a request for reconsideration, the court reversed course, found a violation, and dismissed the indictment without prejudice.

In November 2006, a grand jury re-indicted Franklin on three counts of cocaine possession-with-intent-to-distribute and one count of felon-in-possession-of-ammunition, all stemming from the three episodes set forth in the facts above.  Under the new indictment, Franklin moved again for dismissal, this time with prejudice, for violations of the Speedy Trial Act and the Sixth Amendment.  The court denied the motion, and Franklin was convicted on all counts after a six-day trial.

On appeal, Franklin raises only the Speedy Trial Act and suppression issues.  We have jurisdiction under 28 U.S.C. § 1291.

---

[2] The hearing, originally scheduled for November 3, 2005, was postponed for about two and a half weeks after Franklin was granted a continuance.

-9-

**ANALYSIS**

**Speedy Trial Act**

The Speedy Trial Act was enacted to effectuate the Sixth Amendment's right to a speedy trial in criminal prosecutions. See United States v. Scott, 270 F.3d 30, 53 (1st Cir. 2001); H.R.Rep. No. 96-390, at 2-3 (1979), reprinted in 1979 U.S.C.C.A.N. 805, 807. The Act provides at 18 U.S.C. § 3162(a)(2) that "[i]f a defendant is not brought to trial within the time limit" established elsewhere in the Act, then "the information or indictment shall be dismissed on motion of the defendant." Because the parties agree that Franklin was not timely brought to trial, the issue here is whether dismissal with prejudice is necessary under the Act.

The Act at § 3162(a)(2) speaks to this issue directly:

> In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: [1] the seriousness of the offense; [2] the facts and circumstances of the case which led to dismissal; [3] and the impact of a reprosecution on the administration of this chapter and on the administration of justice.

In considering the other factors adverted to in the Act, this court has hewn to the principle that any such factors must be "rationally related to the balancing objectives of the tripartite test." United States v. Hastings, 847 F.2d 920, 924 (1st Cir. 1988). Thus, these factors may include "the length of the delay and the prejudice to the defendant stemming from the violation (or conversely, the absence of prejudice)." Id. Indeed, we have come

-10-

to describe prejudice to the defendant as the fourth factor for courts to consider. See United States v. Barnes, 159 F.3d 4, 16 (1st Cir. 1998). In the end, however, one policy underrides our analysis: dismissal with prejudice is "a last and rare resort." United States v. Dessesaure, 556 F.3d 83, 85 (1st Cir. 2009).

Our standard of review is abuse of discretion, see id., but the district court's decision is sound enough to withstand even significantly more searching scrutiny; indeed, it is sufficiently well-constructed to stand on its own. Nevertheless, we will briefly expound on each of the factors set forth above.

First, Franklin concedes that his crime was serious, and rightly so. Both common sense and court precedent command the conclusion that the possession on multiple occasions of large quantities of drugs and ammunition is serious. See, e.g., id. at 86.

Second, Franklin argues that the facts and circumstances of the delay in this case are like those in United States v. Stayton, 791 F.2d 17 (2d Cir. 1986), where the Second Circuit held that a 23-month delay between voir dire and swearing in the jury warranted a dismissal with prejudice.[3] Applying the second factor, the Stayton court noted that "the [district] court ignored the persistent prodding of the government to decide . . . outstanding

---

[3] As Franklin does, we consider the length of delay under the facts-and-circumstances prong rather than setting it out as a separate factor.

motions and proceed to trial." Id. at 21. Given that specific context, the court held that "the enormity of the delay" was enough "to tip th[e] second factor in favor of dismissal of the indictment with prejudice." Id. at 22.

The government argues that this case is controlled by Scott, 270 F.3d 30, where we held that a 124-day wait for an order on a motion to suppress warranted only dismissal without prejudice. Among the factors supporting dismissal without prejudice was our determination that "the facts and circumstances of the delay do not show any bad faith on the part of the government"; instead, "[t]he delay was largely due to the district court, which acted without clear guidance by the law on the point." Id. at 58. Scott's holding reflects our practice of looking to whether there is government "culpability" as the focus of our facts-and-circumstances analysis. See United States v. Hastings, 847 F.2d 920, 925 (1st Cir. 1988).

The government is correct: Scott controls, and Stayton does not. There are many reasons for this, not least of which is that Scott is binding in this circuit while Stayton is not. Additionally, Scott is squarely on point here: in both cases, the delay stemmed from the court's belated decision to hold an evidentiary hearing and then require more briefing and not from any government misconduct. See Scott, 270 F.3d at 54. We made clear

in Scott that these circumstances favor dismissal without prejudice. Id. at 58.

Stayton, on the other hand, is not only non-binding but also inapplicable here because of its vastly different facts. In Stayton, there was no indication that the defendant bore any responsibility for the delay, for which the reviewing court could not discern "a single justifying reason." Stayton, 791 F.2d at 20. Here, Franklin's responsibility was twofold: he requested a continuance and later remained silent about the delay until he filed the motion to dismiss. See Dessesaure, 556 F.3d at 86 (reversing dismissal with prejudice where "the defendant was as well-placed to remind the judge [about the delay] as was the prosecutor"). Additionally, in Stayton the delay was 23 months; here, the delay — whether 180 days, as the district court found, or 234, as Franklin argues — was far shorter. In the end, then, Scott controls, Stayton is wholly inapposite, and the facts and circumstances of the delay strongly favor the government.

Third, Franklin suggests that dismissal without prejudice would disrupt the administration of justice and of the Speedy Trial Act by effectively extracting the Act's teeth. This argument ignores the Act's specific inclusion of dismissal without prejudice as a sanction, and that sanction's several teeth: the cost to the government in bringing a new prosecution, the possibility of statute of limitations issues, the chance of failure to re-indict,

-13-

and the risk of losing evidence and witnesses over time; the argument has therefore been roundly repudiated by both this court and the Supreme Court. See United States v. Taylor, 487 U.S. 326, 342 (1988) ("Dismissal without prejudice is not a toothless sanction."); Barnes, 159 F.3d at 17-18 (quoting same). We need say no more on that.

Fourth and finally, Franklin does not suggest how he might have been prejudiced by the delay, instead espousing the proposition that where "serious enough" delay occurs, "it [i]s unnecessary to determine the extent to which the defendant ha[s] actually been prejudiced." But the delay here was not extreme, and it resulted at least in part from Franklin's own request for a continuance and subsequent inaction. More importantly, Franklin's suggestion that we bypass prejudice belies a glaring weakness in his argument: there is nothing in either the record or the briefs to indicate that he actually was prejudiced in any way by the district court's delay. Accordingly, the fourth factor tips the scale still further in the government's favor.

Thus, the record reveals a serious crime, a somewhat lengthy but innocuous delay, a just sanction, and no harm to Franklin. Far from being an abuse of discretion, the district court's dismissal without prejudice was utterly appropriate.

**Motion to Suppress**

The Fourth Amendment protects "[t]he right of the people to be secure . . . against unreasonable searches." U.S. Const. amend. IV. This right is given effect through the exclusionary rule, which "forbids the use of improperly obtained evidence at trial." Herring v. United States, 129 S. Ct. 695, 699 (2009). Here, Franklin asserts that the drugs found in the trunk of the Taurus sedan were obtained in violation of the Fourth Amendment and, therefore, that the district court erred in denying his motion to suppress this evidence. Specifically, Franklin argues that he did not consent to the officers' search, and that the officers had neither a warrant nor probable cause to otherwise justify their actions. We review de novo the legal questions underlying these arguments, accepting as true the court's factual assessments unless clearly erroneous. See United States v. Marshall, 348 F.3d 281, 284 (1st Cir. 2003).

### Consent

There is no dispute that a "specifically established exception[]" to the Fourth Amendment's "requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." United States v. Vilches-Navarrete, 523 F.3d 1, 15 (1st Cir. 2008) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)) (internal quotation marks removed). For consent to be valid, it must be given knowingly, intelligently, and voluntarily.

-15-

See Marshall, 348 F.3d at 286. This brief recitation of the law is all that is necessary here because the law is not in dispute: Franklin has elected to focus his attack on the factual determinations underlying the district court's decision.

First, Franklin says that "[t]he issue of whether [he] voluntarily consented to the search of the trunk of his car depended upon resolving a conflict between the testimony of two DEA task force agents, George MacLaughlin and Michael Cashman, on the one hand," and his own testimony, on the other. Franklin suggests that the officers' testimony is so implausible that no reasonable fact-finder could possibly have subscribed to it rather than his own. For example, Franklin asserts that "[h]owever cooperative he appeared to be, the last thing he would have done was to tell the police where they could find the drugs that he was supposedly trying to hide from them." And yet according to Franklin's own testimony, he told the officers that he had gone to the car "to smoke some weed." That weed must have come from somewhere: either he brought it with him to the car, or it was already in the car. In either case, it ended up in the car. Given Franklin's testimony, then, it hardly seems improbable that Franklin might have admitted to the officers that there were drugs in the car. Moreover, courts have routinely rejected the notion that testimony is implausible merely because it recounts a defendant's acting against his own self-interest. See, e.g., United States v.

-16-

Mendenhall, 446 U.S. 544, 559 (1980). Overall, Franklin's attempts to draw inconsistencies and implausibilities from the officers' testimony are barely colorable; they come nowhere near the clear error threshold.[4]

Franklin's other primary argument on this point — that the officers' testimony is suspect because it is not corroborated by a consent form — likewise holds no water. A consent form certainly would have made the prosecution's task easier, but it was not necessary, and its absence does not undercut the officers' consistent testimony. Indeed, our case law is clear that "[w]ritten consent is not essential to the establishment of a valid consensual search." United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993).

A consent form was particularly unnecessary here given other evidence sufficient to establish consent: specifically, uncontested testimony that Franklin told the officers to "do what you got to do." The district court concluded that this unenthusiastic statement evinced consent, and given circuit precedent upholding consent under similar circumstances, this

_____

[4] Such is the case with Franklin's arguments that the officers' testimony is implausible because (1) his comment about the car being in his mother's name was a non-sequitur, and (2) experienced officers would never bother asking consent to search a car after a suspect has already admitted there are drugs in the car. Contrary to Franklin's contentions, it is quite plausible that the former was a halfhearted attempt at evasion and the latter was simply belt-and-suspenders police work.

-17-

conclusion was not clear error.  See United States v. Zapata, 18 F.3d 971, 974, 977 (1st Cir. 1994) (consent clear from statement: "Sure, go ahead"); Barnett, 989 F.2d at 556 (consent clear from statement: "Go ahead; you'd probably get a search warrant anyway"). Franklin's statement, particularly viewed in light of his prior statements about the car and his choice to surrender ammunition to the officers, could reasonably be construed as consent.

Finally, Franklin asserts that this case is factually similar to United States v. Escobar, 389 F.3d 781 (8th Cir. 2004), in which a panel of the Eighth Circuit held that the defendants' consent to a search of their luggage was not voluntary because they had simply "acquiesced to the search believing [they] had no choice." Id. at 786.  However, Escobar neither binds us nor offers us any persuasive value given the utterly distinct facts of this case.  In Escobar, the police knew nothing about the defendants, who were random bus passengers subject to a general sweep, or their criminal history, see id. at 782-83; here, officers knew Franklin — including his criminal history and his consequent familiarity with criminal procedure — quite well, having spent about a year building a drug case against him.[5]  In Escobar, officers lied to the defendants and claimed that drug-detection dogs had already

_____

[5] Actually, the officers' familiarity stretched far past the investigation giving rise to this case; at the time of Franklin's arrest, for example, Detective Fratalia had maintained a cordial if adversarial working relationship with him "since the late 1980s."

alerted to their luggage, see id. at 783, 786; here, the police did not lie to Franklin — even Franklin's own account demonstrates a candid conversation in which he freely admitted to having marijuana in the car that was searched.  And, most importantly, in Escobar, the officers did not advise the passengers of any of their rights, see id. at 783, 786; here, Franklin was immediately advised of his Miranda rights — including the right to remain silent — and he indicated he understood those rights.  Thus, the circumstances that the court found were relevant to the Escobar defendants' "believing [they] had no choice" — lack of demonstrated familiarity with criminal procedure, lies designed to elicit consent, and no notice of a right to remain silent — were entirely absent here.[6] Franklin's reliance on Escobar is misplaced, and it was not clear error for the district court to find Franklin's consent voluntary.

### Probable Cause

Even if the district court's consent finding were questionable — and the above discussion should make clear that it is not — the automobile exception to the Fourth Amendment's warrant requirement would vindicate the officers' search because the agents had probable cause to believe that the Taurus contained drugs.  See United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004) ("A

---

[6] We reject the notion that the district court clearly erred when it found that the officers had not threatened to tow Franklin's car and obtain a search warrant.  However, even assuming such an error, the facts and circumstances spelled out above would still overwhelmingly favor a finding of consent.

warrantless search of an automobile will be upheld if 'officers have probable cause to believe that the vehicle contains contraband.'") (quoting <u>United States</u> v. <u>Ross</u>, 456 U.S. 798, 808 (1982)).  To put it briefly: the agents testified Franklin told them there was marijuana in the car; the district court credited the agents' version of events in finding probable cause; and we have already held that the district court's factual findings are far from clearly erroneous.  Thus, the probable cause question is quickly dispatched.

### CONCLUSION

The district court adequately addressed an admitted Speedy Trial Act violation by dismissing Franklin's charges without prejudice.  Franklin's conviction was properly based in part on a vehicle search that was legal in every respect.  Accordingly, we **<u>affirm</u>**.